Filed 9/11/14  P. v. Perez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066231 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1101215) |
| JOHN ANTHONY PEREZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Elisabeth Sichel, Judge.  Reversed in part, affirmed in part and remanded.

Raymond M. DiGuiseppe, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Laura A. Glennon, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found John Anthony Perez guilty of first degree murder (Pen. Code, § 187, subd. (a)),[1] with the further finding that Perez personally and intentionally discharged a firearm and proximately caused great bodily injury or death (§§ 12022.53, subd. (d), 1192.7, subd. (c)(8)).  Perez admitted two serious and violent felony offenses, and the trial court sentenced him to prison under the "Three Strikes" Law (§§ 667, subds. (b)-(i), 1170.12) to a term of 100 years to life.

Perez contends (1) the trial court improperly admitted evidence concerning a bullet core found at the scene of the murder and a gun found in Perez's vehicle; (2) insufficient evidence supports the verdict; (3) defense counsel was ineffective because she failed to argue that Perez was not present during the shooting; (4) Perez did not make a voluntary and intelligent waiver of his fundamental rights when admitting his two prior convictions for serious and violent felonies; and (5) the trial court abused its discretion in denying Perez's motion to strike his prior serious and violent felony convictions.

We agree with the People's concession that Perez did not voluntarily and intelligently waive his rights when admitting his prior serious and violent felony convictions, and that the adjudication of the prior conviction allegations should be vacated.  However, we find no merit to Perez's remaining contentions.  We accordingly reverse the judgment to the extent it adjudicates that Perez incurred two prior serious and violent felonies, and we remand for further proceedings.

---

1       Unless otherwise indicated, all further statutory references are to the Penal Code.

2

# I

## FACTUAL AND PROCEDURAL BACKGROUND

Juan Carlos Diaz was shot and killed shortly before midnight on May 22, 2010, during an argument that took place on the street outside of Jose Barrojas's home in Moreno Valley. Four witnesses to the shooting spoke to police about the incident and later testified at trial.

A. *Evidence Provided by Andrew Diaz*

According to the trial testimony of Diaz's nephew, Andrew Diaz (Andrew),[2] the shooting occurred during an argument over the eviction of Diaz's girlfriend, Dianna Garcia (Dianna) from Barrojas's house. As Andrew testified, Diaz, Dianna, Andrew, and Dianna's niece Naidene Garcia (Naidene) arrived at Barrojas's house in Diaz's car late in the evening of May 22, 2010. Barrojas approached Dianna, who was in the car, and asked for the house keys, but Dianna refused to hand them over. Three other men were present with Barrojas, one of whom Andrew identified as Perez. At some point, Diaz and Andrew got out of the car.

According to Andrew, Perez walked by Diaz's car with a second man and said, "What's up" to Diaz, enabling Andrew to clearly see Perez's face. The four men briefly went inside of Barrojas's house, turned off the porch light and then came back out and approached the car again. According to Andrew, the men asked for the house keys in a

---

[2]    To avoid confusion due to shared surnames, we refer to certain witnesses by their first names, and we intend no disrespect by doing so.

3

rude manner, and Diaz said, "I don't have no house key," referring them to Dianna. Perez extended his arm and shot Diaz in the chest with a single shot from a gun that Andrew believed might have been a Glock. The bullet went through Diaz's chest and exited through his back. Andrew then saw Perez pick up the expended bullet shell and drive away by himself in a black car.

Andrew had no doubt at trial that Perez was the shooter and that he had clearly seen Perez's face. However, Perez makes much of the fact that during a police interview, Andrew was shown a photographic lineup containing Perez's photo, and although Andrew stated that Perez looked most similar to the shooter, he was not certain. Further, immediately after the shooting, Andrew was shown Perez's DMV photo and did not identify him as the shooter.

B.    *Evidence Provided by Jose Barrojas*

Barrojas identified Perez to police in a photographic lineup in November 2010. Specifically, Barrojas stated that he knew Perez as "Sapo," and that Perez was the person who shot Diaz. Barrojas also told police that Perez had threatened to kill him in connection with giving information in this case, and Barrojas identified Perez in the photographic lineup only after confirming that Perez was in custody. Consistent with his statements to police in November 2010, Barrojas stated to police immediately after the shooting that "Sapo" was the person who shot Diaz.

At trial, however, Barrojas did not provide an identification of Perez as the shooter. Instead, Barrojas consistently claimed memory loss about the details of the shooting that might implicate Perez and did not remember what he previously told police.

4

It is obvious from Barrojas's testimony that his loss of memory was a tactic to avoid providing evidence at trial that might put him or his family in jeopardy. Specifically, Barrojas admitted at trial that he had received threats connected to his testimony in this case, that he was afraid for the safety of his family, and that he was choosing to answer questions in a certain way as a form of protection for his family.

C.      *Evidence Provided by Miguel Hernandez*

Barrojas's cousin, Miguel Hernandez, was also present during the shooting. In a May 2010 interview, Hernandez told police that Sapo was there on the night of the shooting, and he identified Perez as Sapo in a photographic lineup. Hernandez also told police that he heard Dianna yell out "Sapo" immediately after the shooting, and that Sapo called him a few minutes after the shooting to suggest to Hernandez that he hadn't seen Sapo at the scene. Indeed, phone records show a call from Perez to Hernandez minutes after the shooting, and the cell phone tower registering the call from Hernandez is within a few miles of the location of the shooting. Perez's cell phone records also showed that Perez had been communicating with both Hernandez and Barrojas on the evening of the shooting.[3]

---

[3]      Perez argues that there was insufficient evidence connecting him with the cell phone involved in the calls on the night of the shooting. We reject that argument, as the jury could conclude from strong circumstantial evidence that the phone number belonged to Perez based on the fact that "John Perez" in Moreno Valley was the subscriber, the relevant cell phone records number contained a number of calls to Hernandez, and the same telephone number was in Barrojas's contacts listing as "Sapo."

Hernandez did not testify at trial to all of the things he earlier told police. Hernandez admitted to being present during the shooting. However, he claimed that he only met Perez once at a party and that Perez was not there on the night of the shooting. According to Hernandez's testimony, he was not watching when the shooting occurred and did not know the identity of the shooter. Hernandez denied telling police that Perez had phoned him immediately after the shooting.

D.    *Evidence Provided by Naidene Garcia*

Naidene testified that she watched the shooting from the backseat of Diaz's car, and she remembered that it happened after a long argument between Barrojas and Dianna, in which Dianna refused to return Barrojas's house keys. Three other men were with Barrojas: Hernandez and two men who Naidene may have seen before at a party. Naidene did not see the shooter's face, but she saw a semiautomatic gun in his right hand. The shooter was one of the two other men, not Hernandez; he was chunky and short; and was wearing dark blue pants and a black sweater. Naidene was not able to identify Perez as the shooter in the courtroom or earlier in a photographic lineup, but she remembered hearing Dianna or Hernandez yelling "Sapo" immediately after the shooting.

E.    *Perez's Interview with the Police*

At trial, the jury was played a recorded interview between police and Perez that took place in August 2010. Perez denied being at Barrojas's house on the night of the shooting, even when confronted with cell phone records that put him in the vicinity. Perez claimed he had left his cell phone in the car overnight on May 22, 2010, and thus did not have it with him around the time of the shooting. Although Perez claimed during

6

his police interview that he had not used the nickname Sapo for 15 or 20 years, the People presented evidence at trial that Perez had referred to himself as Sapo in a recorded telephone conversation in February 2011.  The jury heard evidence that a gun holster was found at the scene of the shooting with DNA on it that connected it to Perez.  The police asked Perez about the holster during the interview, and Perez claimed that his DNA would not be found on any holster at the scene of the shooting.

F.      *Perez's Conviction and Sentence*

The jury convicted Perez of first degree murder (§ 187, subd. (a)) and made a true finding that Perez personally and intentionally discharged a firearm and proximately caused great bodily injury or death (§§ 12022.53, subd. (d), 1192.7, subd. (c)(8)).  The trial court sentenced Perez under the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12) to a prison term of 75 years to life for the murder conviction, plus 25 years to life for one of the firearm enhancements (§ 12022.53, subd. (d)).

II

DISCUSSION

A.      *The Trial Court Properly Admitted Evidence of Perez's Firearm and the Bullet Core Found at the Scene of the Shooting*

We first consider Perez's argument that the trial court improperly admitted certain evidence that Perez unsuccessfully sought to exclude during motions in limine.  First, Perez sought to exclude evidence of People's exhibit 46, which was a Glock 17, nine-millimeter gun found in Perez's vehicle during a traffic stop in August 2010, several months after the May 2010 shooting.  Second, Perez sought to exclude evidence related

7

to People's exhibits 17 and 58, which were a bullet core that police recovered at the scene of the shooting after a neighbor in the same cul-de-sac noticed it in his driveway the next morning, and a photo of the bullet core.

As relevant here, a ballistics expert testified that the bullet core was of the type that could have been shot from the model of gun that was found in Perez's vehicle.[4] However, the bullet core also could have been fired from several other types of guns, and because the jacket of the bullet was not recovered, it was not possible to analyze whether the bullet had been fired from Perez's gun.

Perez contends that both items of evidence should have been excluded under Evidence Code section 352 because if they have any relevance at all to this case, it is very minimal, and there was a danger of undue prejudice from their admission into evidence.[5] As we will explain, we disagree.

Pursuant to Evidence Code section 352, "[a] trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of

_____

[4]  As the ballistics expert explained, a bullet core is a bullet in which the outside covering of the bullet is no longer present.

[5]  Although Perez's argument is not clear, he also may be intending to argue that regardless of the prejudicial nature of the evidence, it also should have been excluded because it did not meet the basic relevancy threshold for admission.  Subject to statutory exceptions, "all relevant evidence is admissible."  (Evid. Code, § 351.)  Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (*Id*., § 210.)  To the extent Perez is advancing a pure relevancy argument, we address the lack of merit to that argument in connection with our discussion of probative value of the contested evidence during our analysis under Evidence Code section 352.

8

undue prejudice, confusion, or consumption of time." (*People v. Scott* (2011) 52 Cal.4th 452, 490 (*Scott*).) " ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " ' " (*Id*. at p. 491.) "Rulings regarding relevancy and Evidence Code section 352 are reviewed under an abuse of discretion standard." (*People v. Lee* (2011) 51 Cal.4th 620, 643.)

In conducting our analysis under Evidence Code section 352, we first examine the probative value of both the bullet core and the gun found in Perez's vehicle.

Perez argues that the bullet core had little or no probative value in this case because it was likely not connected in any way to the shooting that occurred on May 22, 2010. Specifically, Perez argues that the bullet core was purportedly old and dirty and the police debated whether to collect it at all, making it unlikely that it was related to a shooting that had just occurred. We reject Perez's argument because it is based on a misunderstanding of the trial testimony.

The jury heard testimony at trial about two *different* bullets that the police collected from the scene of the shooting. The first bullet was People's exhibit 58 (also depicted in the photo in People's exhibit 17), and was examined by the ballistics expert, who opined that it could have come from a gun like Perez's. That specific bullet was found in a neighbor's driveway in the same cul-de-sac as Barrojas's house on the morning after the shooting. The second bullet was depicted in a photograph marked as People's exhibit 5. The second bullet was a live 357 Magnum round located by the police in a

9

sewer and was very dirty and appeared to be old, so that the police debated whether it should be collected as evidence. The old and dirty 357 Magnum round is *not* the bullet that the ballistics expert testified could have been fired from Perez's gun.

Here, the bullet core was relevant evidence, as there is a reasonable possibility that it was connected to the shooting for which Perez was being prosecuted. Specifically, the bullet exited Diaz's torso after passing through it, the bullet core was found early on the morning after the shooting in a nearby neighbor's driveway, and the bullet's physical characteristics and location did not rule it out as the bullet that killed Diaz.

Perez also argues that there was no relevance to the fact that police found a Glock 17, nine-millimeter gun in his car during a traffic stop in August 2010. We disagree. The gun found in Perez's possession had probative value because it creates a possible link between Perez and the shooting. For one thing, Andrew testified that based on his knowledge of firearms, he believed that the gun he saw the shooter using to kill Diaz could have been a Glock. Therefore, the fact that Perez owned a Glock gun could be used as one piece of a circumstantial evidence in support of a finding that Perez was the shooter. Second, Perez's possession of the Glock 17 gun had probative value because there was a possible link between Perez's gun and the bullet core found on the morning after the shooting. As the ballistics expert testified, the type of gun found in Perez's possession was one type of gun that *could have* fired the bullet core. Thus, although there was not a *strong* link between Perez's possession of the gun and the possibility that he was the shooter, the fact did have some tendency in reason to support the ultimate finding and was therefore relevant. (See *People v. Riser* (1956) 47 Cal.2d 566, 577

10

["When the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed. There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon."].)

Next, considering whether the evidence of the bullet core or Perez's possession of the Glock 17 was unduly prejudicial, we agree with the trial court that those items did not give rise to a significant risk of undue prejudice. The ballistics expert made it clear that she was not able to link the bullet core to the gun that was found in Perez's possession because the jacket of the bullet was missing, so that the most she could determine was that Perez's gun was one of several models of guns that could have shot the bullet core. Based on that unambiguous testimony, it is unlikely that a juror would have jumped to the unwarranted conclusion that Perez was the shooter merely because he possessed the type of gun that *could have* shot the bullet core. Further, as the trial court correctly pointed out, Perez's possession of a gun, standing alone, does not create a significant risk of prejudice by evoking an emotional bias against Perez (*Scott*, *supra*, 52 Cal.4th at p. 490) because many law-abiding people possess guns for many different reasons.

In sum, we conclude that the trial court did not abuse its discretion by admitting evidence relating to the bullet core and Perez's possession of a gun.

B.      *Sufficient Evidence Supports the Verdict*

We next consider Perez's contention that the verdict is not supported by substantial evidence. Specifically, Perez contends that looking at the evidence as a whole, there is

11

"no more than a scintilla of evidence that [Perez] was the shooter" and that "the greater balance of the record . . . directly refutes the notion that [Perez] shot [Diaz]." As we will explain, Perez's argument lacks merit.

In considering a challenge to the sufficiency of the evidence, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . . We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. . . . If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. . . . 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 60, citations omitted.) "Although it is the *jury's* duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the *jury*, not the *appellate court* that must be convinced of the defendant's guilt beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054, italics added.)

Here, ample evidence supports a finding that Perez was present at the scene of the crime and was the person who shot Diaz. First, both Andrew and Barrojas were eyewitnesses who identified Perez as the shooter. Although Barrojas's identification of Perez as the shooter occurred during interviews with police and not at trial, the jury could reasonably conclude that Barrojas was telling the truth to the police and not during his

12

trial testimony, as Barrojas admitted that he had been threatened and that his trial testimony had been influenced by the threats. Further, although Naidene did not see the shooter, she remembers someone yelling "Sapo" immediately after the shooting, and her physical description of the shooter was consistent with Perez's characteristics. Hernandez also told police that Perez was present during the shooting. Although Hernandez testified differently at trial, the jury could reasonably conclude that his trial testimony was not credible because he had received threats or was attempting to protect Perez. Perez's cell phone records also placed him near the scene of the shooting and showed that he had been communicating with both Hernandez and Barrojas on the evening of the shooting, and the DNA on the holster found at the scene matched Perez's DNA.

Based on all of these facts, substantial evidence supports a finding that Perez was the person who shot Diaz.

C.    *Perez Has Not Established That Defense Counsel Was Ineffective During Closing Argument*

During closing argument, defense counsel adopted the strategy of arguing that Perez *was present* during the shooting, but that the *actual shooter* was an unidentified person, whom all of the witnesses were protecting by falsely identifying Perez. Specifically, defense counsel argued, "what you have been listening to is the trial of a man who was a witness to the shooting of Juan Carlos Diaz, the guy who happened to be there." Defense counsel acknowledged that that "John Perez lied when he said he wasn't there. He was there." However, she argued that "Nobody wants to tell the truth about

13

who the shooter is.  That should be painfully obvious.  It should be as equally obvious that the shooter is not in the courtroom."

Defense counsel then reviewed certain statements that witnesses made to police when describing the shooting, which could support the inference that the actual shooter was the other man who was with Perez, but not Perez himself.  Among other things, there was some confusion about Andrew's description to the police of the clothing and movements of the different men present at the scene, which, along with Andrew's failure to identify Perez in a photographic lineup, could be interpreted to mean that Andrew had excluded Perez as the shooter immediately after the shooting.  Further, Naidene stated that she saw the shooter run toward the house after the shooting, which together with other evidence — including Perez's cell phone records — might have called into doubt whether Perez was the person who shot Diaz.

Perez contends that defense counsel was ineffective because she took the approach of conceding that Perez was at the scene of the shooting rather than arguing, at least in the alternative, that Perez was not there at all.

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel."  (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.)  A defendant claiming ineffective assistance of counsel has the burden to show:  (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance resulted in prejudice.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *Ledesma*, at pp. 216, 218.)

14

Prejudice is shown when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.)

Further, as is important here, "[r]eviewing courts reverse convictions on direct appeal on the ground of incompetence of counsel only if the record on appeal demonstrates there could be no rational tactical purpose for counsel's omissions." (*People v. Lucas* (1995) 12 Cal.4th 415, 442; see *People v. Anderson* (2001) 25 Cal.4th 543, 569.) "In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

"The right to effective assistance extends to closing arguments. [Citations.] Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." (*Yarborough v. Gentry* (2003) 540 U.S. 1, 5-6.) "The decision of how to argue to the jury after the presentation of evidence is inherently tactical[,]" and in that context our Supreme Court has acknowledged "the importance of maintaining credibility before the jury." (*People v. Freeman* (1994) 8 Cal.4th 450, 498.) "[G]ood trial tactics often demand complete candor with the jury, and . . . in light of the weight of the evidence incriminating a defendant, an attorney may be more realistic and effective by avoiding

15

sweeping declarations of his or her client's innocence."  (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1060-1061.)  Thus, for example, in *People v. McPeters* (1992) 2 Cal.4th 1148, when several eyewitnesses put the defendant at the scene of the crime, but the defendant testified that he was not there, our Supreme Court rejected an argument that counsel was ineffective in closing argument for conceding the defendant's presence. Counsel was merely taking a strategic approach to "make the best of a bad situation." (*Id.* at p. 1187.)

Here, in light of the evidence, defense counsel reasonably could have concluded that she would lose credibility if she attempted to argue that Perez was not at the scene of the crime.  Perez's cell phone records placed him near the shooting.  Further, Perez's DNA was found on the holster recovered from the crime scene.  Either in conversations with police or at trial, each of the four eyewitnesses placed Perez at the scene of the shooting.  Hernandez, Barrojas and Andrew all stated that Perez was at the scene, and Naidene heard someone yell Perez's nickname, Sapo.

Although Perez claimed during his police interview that he was not at the scene, and he attempted to explain cell phone records putting him near the shooting by claiming that he left his phone in a car all evening and the car was used by someone else, the evidence undermines that claim.  Records of calls between Perez's phone and Hernandez and Barrojas during the time that Perez was supposedly away from his phone suggest that Perez was actively using his phone around the time of the shooting.

In sum, because unrefuted evidence put Perez at the scene of the shooting, it was a reasonable tactical choice for defense counsel to concede Perez's presence at the scene of

16

the shooting and to concentrate instead on the evidence suggesting that Perez may have been misidentified as the shooter. Perez has accordingly not established ineffective assistance of counsel.

D. *The Trial Court Erred in Not Properly Advising Perez When Accepting Perez's Admission of His Prior Convictions*

The operative information alleged that Perez incurred two prior convictions in 1987 that constituted serious and violent felonies under the Three Strikes law. Immediately following the return of the jury verdicts, the trial court accepted Perez's admission that he incurred the two prior felony convictions alleged in the information.

Perez contends that the proceedings were defective because the trial court did not advise Perez of his right to a jury trial, his right to confront witnesses and his right against self-incrimination, and Perez did not waive those rights. The People concede that the trial court erred, that the trial court's adjudication of the prior conviction allegation should therefore be vacated, and this matter should be remanded for further proceedings regarding the prior convictions. As we will explain, we agree with the People's position.

The trial court engaged in the following dialogue with Perez when accepting his admission of his prior convictions:

"THE COURT: . . . Mr. Perez, the following priors have been alleged: The first is that on or about September 21st, 1987, in the Superior Court of the State of California for the County of Riverside, you were convicted of the crime of assault with a firearm, a serious and violent felony in violation of Penal Code section 245, [subdivision (a)](2), within the meaning of Penal Code [section] 667, subdivision[s] (c) and (e)(2)(A) and [section] 1170.12, subdivision (c)(2)(a). Sir do you wish to admit or deny that you suffered that prior conviction on September 21st, 1987, for assault with a firearm?

17

"THE DEFENDANT:    Admit

"THE COURT:    All right.  And the second prior is that — oh, it's a special prior offense.  It's the same prior."

"[PROSECUTOR]:  I'm sorry, Your Honor.  It's two counts from the same date but two separate counts, two separate victims.

"THE COURT:    Oh, it's two separate victims.

"[PROSECUTOR]:  Yes.

"THE COURT:    That on or about September 21st, 1987, you were convicted of assault with a firearm, a serious and violent felony in violation of Penal Code section 245[, subdivision (a)](2), and that there were two separate victims of that crime.  Do you admit or deny that, sir?

"THE DEFENDANT:    Admit

"THE COURT:    All right.  Anything further, counsel?

"[PROSECUTOR]:  No, thank you, Your Honor.

"THE COURT:    All right.  Then the court finds the special allegations to be true."

Before accepting a criminal defendant's admission of a prior conviction, a trial court must advise the defendant of the right to a jury trial on the prior, the right to remain silent, and the right to confront adverse witnesses.  (*In re Yurko* (1974) 10 Cal.3d 857, 863; *People v. Mosby* (2004) 33 Cal.4th 353, 365, fn. 3 (*Mosby*) ["Ideally, a defendant admits a prior conviction only after receiving, and expressly waiving, standard advisements of the rights to a trial, to remain silent, and to confront adverse witnesses."].)

When a defendant is only *partially* advised about his rights and does not expressly waive all of them, the waiver is valid and the admission is effective if, under the totality of the circumstances, the record establishes that the defendant made a voluntary and

18

intelligent waiver.  (*Mosby*, *supra*, 33 Cal.4th at pp. 360-361.)  However, our Supreme Court has established that in "[t]ruly silent-record cases," in which there is "no express advisement or waiver . . . before a defendant's admission of a prior conviction," a court "cannot infer that in admitting the prior the defendant has knowingly and intelligently waived [the right to a trial] as well as the associated rights to silence and confrontation of witnesses."  (*Id.* at pp. 361-362.)

This case presents a classic example of a "[t]ruly silent[ ]record."  (*Mosby*, *supra*, 33 Cal.4th at p. 361.)  The trial court made no attempt whatsoever to advise Perez of his right to trial, right to silence or right to confrontation of witnesses, or to obtain waivers of those rights.  Accordingly, we cannot infer that Perez understood and voluntarily and intelligently waived those rights.  Perez's admission is therefore ineffective, and we vacate the trial court's acceptance of Perez's purported admission that he suffered two prior serious and violent felonies in 1987, and accordingly reverse that portion of the judgment.[6]

E.      *Perez's Motion to Strike His Prior Serious and Violent Felonies Must Be Vacated and Readjudicated After Further Proceedings on the Allegations Regarding Those Prior Convictions*

At sentencing, the trial court considered Perez's motion to strike his prior serious and violent felonies pursuant to *People v Superior Court (Romero)* (1996) 13 Cal.4th

---

[6]      We note that although a defendant has a statutory right to a trial on the fact of his prior convictions by the same jury as made a finding on his guilt on the crimes in the present matter (§ 1025, subd. (b)), the right to double jeopardy does not bar a retrial on the issue of defendants' prior convictions when that statutory provision is not followed. (*People v. Saunders* (1993) 5 Cal.4th 580, 595.)  There is accordingly no bar to a remand for a trial by a different jury on the allegation of Perez's prior convictions.

497, 508 (*Romero* motion). The trial court denied the *Romero* motion, concluding that based on Perez's long criminal record, he was not outside the spirit of the Three Strikes law. Perez challenges the trial court's denial of the *Romero* motion, contending that it was based on inaccurate information about his criminal history.

As the parties agree, in light of our disposition vacating the trial court's acceptance of Perez's admission of his two prior strike convictions, it is premature for us to consider Perez's challenge to the trial court's denial of the *Romero* motion, as the fact of those convictions have not yet been properly established in this case. We therefore need not, and do not, express a view on whether the trial court abused its discretion in denying the *Romero* motion. Instead, we vacate the ruling on the *Romero* motion so that it may be renewed if and when the fact of Perez's prior strike convictions is established.

DISPOSITION

We reverse the portion of the judgment adjudicating the truth of the allegation that Perez incurred two serious and violent prior felony convictions and adjudicating the *Romero* motion. This matter is remanded for further proceedings consistent with this opinion. In all other respects, the judgment is affirmed.


IRION, J.

WE CONCUR:


HUFFMAN, Acting P. J.


McDONALD, J.

21